UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DJAVAN PERRY,                                            :

                     Petitioner,          :          **MEMORANDUM DECISION**

          - v -                           :          21-CV-994 (DC)

MICHAEL CAPRA, Superintendent, Sing Sing :
Correctional Facility

                                       :

                   Respondent.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:                    DJAVAN PERRY
                                   Petitioner *Pro Se*, No. 13-A-2086
                                   Sing Sing Correctional Facility
                                   345 Hunter Street
                                   Ossining, NY 10562

                                   ERIC GONZALEZ, Esq.
                                   District Attorney, Kings County
                                   By:     Leonard Joblove, Esq.
                                               Diane Eisner, Esq.
                                               Jason Eldridge, Esq.
                                               Assistant District Attorneys
                                   350 Jay Street
                                   Brooklyn, New York 11201
                                       Attorney for Respondent

CHIN, Circuit Judge:

         On April 29, 2013, Petitioner Djavan Perry pled guilty in the Supreme

Court of the State of New York, Kings County (Donnelly, *J.*), to one count of second-

degree murder and two counts of second-degree criminal possession of a weapon.  The

Appellate Division, Second Department, affirmed his conviction and sentence, *People v. Perry*, 101 N.Y.S.3d 614 (2d Dep't 2019) ("*Perry I*"), and the New York Court of Appeals denied his application for leave to appeal, *People v. Perry*, 138 N.E.3d 500 (N.Y. 2019) (Rivera, J.) ("*Perry II*").

On February 22, 2021, Perry filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition").  Dkt. 1.  Respondent Michael Capra, represented by the King's County District Attorney's Office, filed his opposition to the Petition on June 13, 2021.  Dkt. 5.

On March 15, 2024, the case was reassigned to the undersigned.

For the reasons that follow, the Petition is DENIED.

### *STATEMENT OF THE CASE*

**A.**    ***The Facts[1]***

Because Perry pleaded guilty, there is no trial record.  Testimony from Detective David Centeno at Perry's pre-trial suppression hearing on February 1, 2011, however, established the following:

On April 17, 2011, Detective David Centeno learned that Andre Pitts had been shot to death on the fourth floor of 230 Lott Avenue in Brooklyn.  Dkt. 5 at 39.

---

[1] The facts are drawn from the People's brief on the direct appeal to the Appellate Division, which was filed in this Court as part of Respondent's opposition to the Petition.  The recitation of facts set forth in the state appellate brief are supported by detailed citations to the record, including the transcript of the suppression hearing.  *See* Dkt. 5 at 192-200.

Detective Centeno responded to Brookdale Hospital where Pitts had been transported after the shooting, but Pitts was pronounced dead before Detective Centeno could speak with him. *Id.* at 40. Detective Centeno then went to the crime scene and recovered video surveillance of the shooting, which was played on local and national news media. *Id.* at 41, 42.

Two days later, on April 19, 2011, Detective Centeno interviewed Jehen Attiyah a.k.a. "Jo" and "Mantis" (hereinafter referred to as "Mantis"), a leader in the "Bloods" gang, who lived on the fourth floor of 230 Lott Avenue where Pitts was shot. *Id.* at 42, 45. Mantis informed Detective Centeno that she recognized the individual in the video as someone known to her by the name "Goon," whom she later identified in a photographic array as Perry. *Id.* at 43-44, 46. That same day, police received a "Crimestoppers" call also identifying Perry as Pitts's murderer. *Id.* at 43. Mantis stated that Perry was a gang member with the Bloods; and earlier in the year, he was supposed to do a "31," which she described as a fight between two gang members for 31 seconds. *Id.* at 44. But Perry refused to fight, and so Mantis walked up to him and punched him in the face. Mantis stated that, since the punching incident, she and Perry had problems with each other. *Id.* She further stated that on April 17, 2011, before Pitts was killed, she had received a phone call from Perry threatening her by saying that he had a MAC-10. *Id.* In response, Mantis told Perry that she was "at the plaza." *Id.*

After the conversation with Perry, Mantis was looking out her window

and observed Pitts walking towards her building.  But she lost sight of Pitts.  A few minutes later, she heard gunshots.  *Id.* at 44-45.  Mantis stated that she opened the door to her apartment and saw Pitts lying on the floor with gunshot wounds.  *Id.* at 45.

On May 3, 2011, Perry was arrested in Albany on an active bench warrant. He was then transported to the 73rd Precinct.  *Id.* at 52-53.  Upon learning that Perry was at the 73rd Precinct, Detective Centeno made his way to the precinct to speak with Perry.  *Id.* at 52-53.  After waiving his *Miranda* rights, *id.* at 53-55, Perry gave his account of what happened on the day of Pitts's murder:

A week before the homicide, Perry received a phone call from Mantis stating that Pitts was having a relationship with Mantis's wife and that Mantis wanted Perry to kill Pitts.  *Id.* at 55.  In addition, Mantis told Perry that she was afraid that Pitts and her wife were going to kill her because Mantis had recently obtained money from a lawsuit.  *Id.* at 56.  Perry felt loyal to Mantis because she had taken care of him when he had previously been shot, and so he agreed to kill Pitts.  *Id.*

On April 17, 2011 -- the day of the murder -- Perry received a phone call from Mantis stating that she would pick him up from Pitkin and Christopher Streets in an SUV.  *Id.*  Mantis arrived in the car with her new girlfriend as well as a female with tattoos on her face and a child.  *Id.*  They drove to the plaza where 230 Lott Avenue was located and parked the car next to the plaza.  *Id.*  Once they parked, Mantis told Perry that a .38 revolver was inside the console.  *Id.*  Mantis exited the car along with the

4

female with tattoos on her face and the child, while Mantis's girlfriend stayed in the car so she could drive Perry away after he killed Pitts. *Id.* at 56-57. Perry went to a back lot behind the plaza to wait for Mantis to call him. *Id.* at 57.

Mantis then called Perry and told him that she had observed Pitts leave to go "to the store." *Id.* Mantis called Perry again shortly thereafter to tell him that Pitts was on his way back to the plaza. *Id.* Perry left the back lot and saw Pitts walking towards the plaza. *Id.* Perry started to follow behind him. *Id.* Perry planned to kill Pitts on the walkway towards the building but decided against it when he observed a young girl in a pink jacket nearby. *Id.* Instead, Perry continued to follow Pitts into the building where they both waited for the elevator. *Id.* When the elevator arrived, Pitts went in first and pressed the fourth floor. *Id.* Perry then asked Pitts to press the fifth floor for him, which Pitts did. *Id.* When the elevator door opened onto the fourth floor, Pitts walked out, and Perry shot him. *Id.* Pitts fell to the floor. *Id.* Perry then shot Pitts two more times as Pitts lay on the floor. *Id.* After shooting Pitts, Perry got lost in the building before walking out of the complex and taking his hood off. *Id.* At that point, he realized that cameras were all over the building complex, which made him feel as if Mantis had set him up. *Id.* at 57-58.

After Perry gave this oral confession to Detective Centeno, he also agreed to be debriefed by the District Attorney's Office and give a video statement. *Id.* at 59. After the video statement, Perry asked to write a letter to his girlfriend. *Id.* at 61.

Because the letter Perry wrote was a gang-related letter, Detective Centeno told Perry

that the letter would not be delivered to his girlfriend but asked if Perry wanted to

make a written statement, to which Perry replied in the affirmative. *Id.* at 62-63.  Perry

then wrote a statement, which he signed. *Id.* at 63.

On May 3, 2011, at 7:00 p.m., Detective Centeno along with other police

officers took Perry to Canarsie Park where Perry directed them to where he had

disposed of the gun he had used to kill Pitts. *Id.* at 64.  Detective Centeno recovered the

gun, wrapped inside a plastic bag, which Perry had thrown behind some bushes. *Id.* at

64-65.

**B.**    ***Procedural History***

**1.**    ***State Court Proceedings***

***a.***    ***The Trial Court Proceedings***

On February 1, 2011, the court (Donnelly, *J.*) held the suppression hearing,

as discussed above.  From the bench, the court denied Perry's motion to suppress and

inquired as to whether Perry was considering a plea offer. *Id.* at 117-18.  Perry's counsel

stated that he needed to speak more about the plea offer with Perry. *Id.* at 118.  Asked

by the court for the recommendation, the People said, "40 to life, but we had other

discussions." *Id.*  The court said that it thought the recommendation was 25 to life, and

the People said that it was. *Id.*  The court then said:

> [U]nder the circumstances of this case, 25 to life is to me an appropriate
> recommendation.  I'll let you all speak about it.  But this case is really an

6

> execution.  If the case is proved beyond a reasonable doubt, and he does
> face 40 to life if he's convicted.  I'm not saying that -- I'm not saying this to
> threaten the defendant or anything like that, but it's about as serious as it
> gets.

*Id.*  Perry's counsel agreed with the court that Perry could face 40 to life if convicted,

reasoning that the maximum sentence for second-degree murder was 25 to life, and the

maximum sentence for second-degree criminal possession of a weapon was 15 years,

and the sentences could run consecutively to one another.  *Id.* at 118-19.  The court

remarked: "That's right.  And under the circumstances of this case, at least from what

I've seen so far, there's certainly evidence that he intended to possess the gun with

intent to use against another, separate and apart from the evidence of the homicide."  *Id.*

at 119.  The court reiterated that it was not threatening Perry but apprising him of the

risks because "any judge" could likely impose "a very long sentence after trial" in a case

like this.  *Id.*

On April 9, 2013, Perry, represented by counsel, agreed to plead guilty to

the count of second-degree murder in full satisfaction of the indictment in exchange for

a term of imprisonment of 22 years to life.  *Id.* at 125.  In response to questions by the

court, Perry acknowledged that he wanted to plead guilty to the charge.  *Id.*  The court

asked if Perry had an opportunity to speak with his counsel before entering a plea, to

which Perry replied in the affirmative.  *Id.*  When asked if Perry was satisfied with his

counsel's services, Perry stated yes.  *Id.*  Perry then admitted that on April 17, 2011, he

shot Andre Pitts to death with a revolver.  *Id.* at 126.  The court advised Perry that by

pleading guilty he was giving up certain rights.  *Id.*  The court noted that it had already

held a hearing, but that Perry waived any appeal of the results of the hearing.  *Id.*  The

court told Perry that he was also waiving his right to a jury trial and various rights he

would have had at that trial.  *Id.* at 126-27.  The court then said:

> Now, ordinarily even though you are pleading guilty, you would have the
> right to appeal your conviction to a higher court.  That's called the right to
> appeal.  When you appeal, you make claims about this proceeding or this
> sentence that I'm going to impose.  But one of the conditions of the plea is
> you give up your right to appeal.

*Id.* at 127.  The court asked Perry to take time to review the written appeal waiver and

ask counsel any questions about it.  *Id.*  Perry executed the appeal waiver and said he

understood it and was waiving this right of his own free will.  *Id.* at 127-28.

Sentencing took place on April 19, 2013.  *Id.* at 130.  During the sentencing

hearing, the court heard statements from several members of Pitts's family about the

devastating impact his death had on them.  *Id.* at 132-36.  The People argued that Perry

showed no mercy to Pitts by continuing to shoot at him after Pitts had fallen to the floor

after the first shot.  *Id.* at 136.  The People added that Pitts's family was willing to agree

to a plea of manslaughter to give Perry an opportunity to do the right thing by

testifying against a person who was "not in the courtroom" -- "the person who ordered

[him] to pull th[e] trigger."  *Id.* at 137.

Perry's counsel explained that Perry had the opportunity "for a better

sentence in terms of another type of negotiation," but that Perry "ha[d] in his mind

reasons at this moment as to why he's disposing of this this case in this way." *Id.* at 138-39. Perry apologized to the victim's family and said that if he could take it back he would. *Id.* at 139. The court remarked that it was "struck during the hearings . . . by the ease" with which Perry killed Pitts. *Id.* But the court noted that it was "some comfort" that Perry apologized to Pitts's family. Accordingly, it stated that it was willing to give Perry less than the maximum because of his "willingness to accept responsibility" and because, before the murder, Perry seemed to be "on the right track." *Id.* at 139-140.

Accordingly, the court sentenced Perry to the promised term of 22 years to life incarceration. *Id.* at 140.

### b. *The Direct Appeal*

On June 29, 2018, Perry, represented by counsel, appealed to the Appellate Division, Second Department, arguing that (1) his guilty plea was not knowing, intelligent, and voluntary; (2) he was deprived effective assistance of counsel; and (3) his sentence was excessive. *Id.* at 142-84. On June 26, 2019, the Appellate Division affirmed Perry's conviction and sentence, holding that the guilty plea was "entered knowingly, voluntarily, and intelligently," and that, in any event, the issue was unpreserved for appellate review. *Perry I,* 101 N.Y.S.3d at 615 (citations omitted). It also held that Perry was "afforded the effective assistance of counsel," and his contention that his sentence was excessive was precluded by his "valid waiver of the right to

appeal." *Id.* (citations omitted).  On November 20, 2019, the New York Court of Appeals (Rivera, *J.*) denied Perry's application for leave to appeal.  *Perry II*, 138 N.E.3d at 500.

2.   *Proceedings in this Court*

On February 22, 2021, proceeding *pro se*, Perry filed the Petition asserting that (1) his guilty plea was not knowing, intelligent, and voluntary; (2) he received ineffective assistance of counsel; and (3) his sentence was excessive.  Dkt. 1.

On June 13, 2021, the New York State Attorney General's Office filed its opposition to the Petition.  Dkt. 5.

On March 15, 2024, the case was reassigned to the undersigned.

### DISCUSSION

A.   *Federal Review of State Convictions*

A federal court may not grant a habeas petition on a claim that was adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 97-98 (2011); *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017).  Hence, when a claim is adjudicated on the merits, the state court's decision must be accorded "substantial deference." *Fischer v. Smith*, 780 F.3d 556,

560 (2d Cir. 2015).  "A federal court may reverse a state court ruling only where it was

'so lacking in justification that there was . . . [no] possibility for fairminded

disagreement.'"  *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting

*Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per

curiam).

      Moreover, "federal courts will not review questions of federal law

presented in a habeas petition when the state court's decision rests upon a state-law

ground that is independent of the federal question and adequate to support the

judgment."  *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman v. Thompson*, 501 U.S.

722, 729 (1991)).  A state law error is therefore insufficient for habeas corpus relief

unless it rises to a level that implicates a federal constitutional right.  *Wainwright v.

Goode*, 464 U.S. 78, 86 (1983) (per curiam).  Such error does not rise to the level of a

constitutional violation unless the petitioner can demonstrate that the error had a

"substantial and injurious effect or influence" on the jury's verdict.  *Headley v. Tilghman*,

53 F.3d 472, 474 (2d Cir. 1995) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

      Finally, a federal court may not grant the habeas petition of a state

prisoner "unless it appears that the applicant has exhausted the remedies available in

the courts of the State; or that there is either an absence of available State corrective

process; or the existence of circumstances rendering such process ineffective to protect

the rights of the prisoner."  28 U.S.C. § 2254(b)(1).  To satisfy § 2254's exhaustion

requirement, a petitioner must present the substance of "the same federal constitutional claim[s] that he now urges upon the federal courts to the highest court in the pertinent state." *Aparicio v. Artuz*, 269 F.3d 78, 89–90 (2d Cir. 2001) (internal citations and quotation marks omitted).

If a state court's decision regarding a claim "rests on a state law ground that is independent of the federal question and adequate to support the judgment," the claim is procedurally barred, whether the state-law ground is substantive or procedural. *Coleman*, 501 U.S. at 729; *accord Bierenbaum v. Graham*, 607 F.3d 36, 47 (2d Cir. 2010). "When the petitioner fail[s] to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, federal habeas courts also must deem the claims procedurally defaulted." *Aparicio*, 269 F.3d at 90. If a claim is procedurally barred pursuant to an independent and adequate state rule, a federal habeas court may not review it on the merits, unless the petitioner demonstrates (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

**B.**   *Analysis*

I address Perry's claims in the Petition: (1) his guilty plea was not knowing, intelligent, and voluntary; (2) he received ineffective assistance of counsel; and (3) his sentence was excessive. Dkt. 1. I address the first and third claims together.

### 1.   *The Voluntariness of the Guilty Plea and the Excessiveness of the Sentence*

In his first claim for relief, Perry argues that his plea was not knowing, intelligent, and voluntary because he was misinformed regarding his sentencing exposure if he chose to go to trial.  Dkt. 1 at 2.  For his third and final claim, Perry contends that his sentence was excessive.[2]  *Id.*  The Appellate Division held that both claims were procedurally barred, finding that (1) Perry "failed to preserve [the argument regarding the voluntariness of his guilty plea], as he did not move to withdraw his plea prior to the imposition of sentence," *Perry II*, 101 N.Y.S.3d at 614 (citations omitted), and (2) Perry's "valid waiver of the right to appeal precludes appellate review of his contention that the sentence imposed was excessive."  *Id.* at 615 (citations omitted).  The Appellate Division also rejected Perry's first claim on the merits, concluding that "[i]n any event, the record demonstrates that the defendant's plea of guilty was entered knowingly, voluntarily, and intelligently."  *Id.* at 615 (citations omitted).

Habeas relief is thus not available to Perry for either claim.  For an independent and adequate state ground to bar habeas relief, the state court rendering the judgment must "clearly and expressly state that its judgment rests upon a state

---

[2] Although Respondent does not address this claim in his brief, it appears that Perry raises an excessiveness of his sentence claim -- albeit in a cursory fashion -- on page 2 of the Petition.  *See* Dkt. 1 at 2.  Accordingly, I address the claim here.

procedural bar." *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996)).  Here, the Appellate Division clearly and expressly stated that these claims were procedurally barred.

Moreover, Perry has failed to demonstrate that he is entitled to an exception to the procedural default rule, because he has not shown either (1) cause and actual prejudice or (2) that a fundamental miscarriage of justice would occur if the merits of the federal claims were not considered.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citations omitted); *Coleman*, 501 U.S. at 748; *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011).

Even if these claims were not procedurally barred, they still fail on the merits.  First, the Appellate Division addressed the first claim on the merits and rejected it.  That decision was reasonable and is entitled to deference.  Perry has not demonstrated that his plea was entered involuntarily.  Indeed, at the plea hearing, Perry -- who was under oath -- acknowledged that he wanted to plead guilty and was satisfied with his counsel's services, and he admitted to killing Pitts. Dkt. 5 at 125-26. The court explained the consequences of Perry's plea to him at length and told Perry to take time to review the waiver of appeal.  *Id.* at 126-27.  Perry said that he understood the waiver, and in signing it, acknowledged that he was waiving this right of his own free will.  *Id.*  This was more than sufficient to show that Perry entered into the guilty plea voluntarily.  *See, e.g., United States v. Freeman*, 17 F.4th 255, 265 (2d Cir. 2021)

14

(holding that statements made under oath "carry a strong presumption of verity" (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977))); *People v. Mack*, 92 N.Y.S.3d 404, 406-07 (2d Dep't 2019) (finding that the defendant's guilty plea was "knowingly, voluntarily, and intelligently entered" where she "was fully apprised of the consequences of her plea").

Second, Perry's sentence was not excessive.  There is "[n]o federal constitutional issue . . . presented where . . . the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted).  Perry pled guilty to second-degree murder, which carries a maximum sentence of 25 years to life.  *See* N.Y. Penal Law §§ 70.00(1)&(3), 125.25.  Perry was only sentenced to 22 years in prison, which was well within the range prescribed by state law.  *See id.*  Moreover, Perry's actions caused not only the loss of Pitts's life, but a devastating impact on Pitts's family members.  *See* Dkt. 5 at 132-37 (outlining Pitts's family members' testimony). Perry's sentence, though long, was not disproportionate to his crime and, therefore, neither cruel nor unusual under the U.S. Constitution.  *See Solem v. Helm*, 463 U.S. 277, 290 (1983) ("a criminal sentence must be proportionate to the crime for which the defendant has been convicted").

Accordingly, Perry's first and third claims fail.

### 2. *Ineffective Assistance of Counsel*

For his second claim, Perry contends that he was deprived of his Sixth Amendment right to effective assistance of counsel because, during the suppression hearing, his lawyer told him he could potentially receive a sentence of 40 to life, when he could have convinced a jury of his account of the murder at trial and received a different sentence. Dkt. 1 at 5. The Appellate Division rejected this claim on the merits, finding that "the record demonstrates that [Perry] was afforded the effective assistance of counsel." *Perry I*, 101 N.Y.S.3d at 615 (citations omitted). This determination is entitled to "substantial deference," *Fischer*, 780 F.3d at 560, and will not be overturned by a federal court conducting habeas review unless the petitioner can establish that the state court's conclusion was "unreasonable," *see* 28 U.S.C. § 2254(d). Perry has not done so here.

In general, to prevail on a claim of ineffective assistance under federal law, a petitioner must (1) show that counsel's performance was so deficient as to fall below "an objective standard of reasonableness"; and (2) establish prejudice by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). In the context of a habeas petition under 28 U.S.C. § 2254, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' . . . and when

the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted).  Therefore, "[t]he operative question" when a federal court reviews a state court's ineffective assistance of counsel ruling is "not whether [the] federal court believes the state court's determination was incorrect, but rather whether that determination was objectively unreasonable." *Waiters*, 857 F.3d at 478 (alterations adopted) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

The standard to establish an ineffective-assistance-of-counsel claim under New York law is lower than under federal law.  *See People v. Honghirun*, 78 N.E.3d 804, 807 (N.Y. 2017).  In New York, a defendant must show only "that counsel failed to provide meaningful representation." *People v. Alvarez*, 125 N.E.3d 117, 120 (N.Y. 2019) (citing *People v. Stultz*, 810 N.E.2d 883 (N.Y. 2004); *People v. Baldi*, 429 N.E.2d 400 (N.Y. 1981)).  Unlike the federal standard, *see Strickland*, 466 U.S. at 694, under the state standard, the defendant is not required to demonstrate that he was prejudiced by the ineffective assistance.  *See Alvarez*, 125 N.E.3d at 120.

Perry's counsel was correct when he advised Perry that he could face a possible sentence of 40 years to life for the crimes of murder and weapon possession.  The maximum possible sentence for second-degree murder and second-degree criminal possession of a weapon was then 25 years to life and 15 years' imprisonment, respectively.  *See* N.Y. Penal Law §§ 70.00(1)&(3), 70.02(3), 125.25, 265.03.  Accordingly, Perry's counsel accurately told Perry that he could face a sentence of 40 years to life, the

total of the maximum sentences for each of the counts for which he was charged. This statement therefore did not constitute ineffective assistance of counsel. *See Taylor v. United States*, No. 12-CV-04904 CBA, 2015 WL 3883592, at *9 (E.D.N.Y. June 23, 2015) (holding that a statement that "represent[s] an entirely accurate statement of the law" does not constitute ineffective assistance of counsel).

Moreover, to the extent Perry must show prejudice under federal law, he has failed to do so. While he offered a different version of the facts than that provided by Mantis, even under his version, he confessed to shooting Pitts as he walked out of the elevator and twice again as Pitts lay on the floor, killing him. Dkt. 5 at 55-58. And Perry has not pointed to any evidence in the record that suggests that he would not have pleaded guilty if he had not been told by his lawyer that he faced a possible sentence of 40 years to life. Accordingly, Perry's second claim fails.

## *CONCLUSION*

Perry has failed to show a basis for relief under 28 U.S.C. § 2254. Accordingly, the Petition is denied. Additionally, I decline to issue a certificate of appealability because Perry has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253.

The Clerk of the Court shall enter judgment accordingly and close this case. The Clerk of Court shall also mail copies of this memorandum decision and the judgment to Perry at the address set forth above.

SO ORDERED.

Dated:      New York, New York
            April 8, 2024

                                    _____
                                    DENNY CHIN
                                    United States Circuit Judge
                                    Sitting By Designation

19